512 F.2d 37
 Jeffrey HART, as a minor by his parent and next friend,
Doris Hart, et al., Plaintiffs-Appellants,
v.
The COMMUNITY SCHOOL BOARD OF EDUCATION, NEW YORK SCHOOL
DISTRICT #21, a body corporate, et al.,
Defendants-Appellees-Appellants,
Irving Anker, Chancellor of the Board of Education of the
City of New York, Defendant-Appellee.
The COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL
DISTRICT #21, by its President and Member, Evelyn
J. Aquila, et al., Defendants and
Third-Party Plaintiffs-Appellants,
v.
John V. LINDSAY, Mayor of the City of New York, et al.,
Third-Party Defendants-Appellees,
and
Barbara Baucom et al., Applicants for Intervention.
 Nos. 362, 503, 504 and 619, Dockets 74-2076, 74-2262,
 74-2263 and 74-2253.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 17, 1974.
Decided Jan. 27, 1975.
 
 Robert S. Hammer, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for third-party defendants-appellees New York State Div. of Housing and Community Renewal, New York State Urban Dev. Corp. and Officials.
 Jeanne Hollingsworth, New York City (Edward W. Norton, Gen. Counsel, New York City Housing Authority, New York City, of counsel), for third-party defendant-appellee New York City Housing Auth.
 Cyril Hyman, Asst. U. S. Atty., Brooklyn, N.Y (David G. Trager, U. S. Atty., E.D.N.Y., and Paul B. Bergman, Asst. U. S. Atty., of counsel), for third-party defendants-appellees George Romney and William S. Green.
 Nancy E. LeBlanc, MFY Legal Services, New York City (George C. Stewart, MFY Legal Services, New York City, and Thomas N. Rothschild, East New York Legal Services, Brooklyn, N.Y., of counsel), for intervenors.
 James I. Meyerson, N. A. A. C. P., New York City (Nathaniel R. Jones, New York City, of counsel), for plaintiffs-appellants.
 Hyman Bravin, New York City, for defendants-appellees-appellants, Community School Board 21 and its Members.
 Leonard Koerner, New York City (Adrian P. Burker, Corp. Counsel of the City of New York, L. Kevin Sheridan, New York City, and Elliot P. Hoffman, Brooklyn, N.Y., of counsel), for defendant-appellee Chancellor of the City of New York.
 Before FRIENDLY, TIMBERS and GURFEIN, Circuit Judges.
 GURFEIN, Circuit Judge:
 
 
 1
 This is an appeal from a final judgment in what the District Court (Weinstein, J.) described as the first New York City school desegregation case to reach a federal court. Hart v. Community School Board of Brooklyn, New York School District #21, 338 F.Supp. 699 (E.D.N.Y.1974) (opinion); id. at 769 (order).
 
 
 2
 A class action by school children plaintiffs was brought by lawyers for the National Association of Colored People on behalf of children attending Coney Island's Mark Twain Junior High School, J.H.S. 239 ("Mark Twain"). The defendants are the Community School Board of Brooklyn, New York, School District Number 21 ("CSB 21"), its members, and the Chancellor of the Board of Education of the City of New York. The action, begun on August 4, 1972, alleged that the defendants are maintaining Mark Twain as an unconstitutionally racially segregated and underutilized school. The plaintiffs prayed for declaratory and injunctive relief, including a direction to the defendants "to formulate and implement forthwith a comprehensive plan which will eliminate, with deliberate speed, the racially segregated and underutilized nature of Mark Twain Junior High School and which will provide for and assure equal educational opportunities for the plaintiffs and the members of their class." The defendant CSB 21 and its members interposed a general denial and defended on the ground, inter alia, that if segregation exists, it is due to housing patterns fostered and maintained by the city, state, and federal authorities who have been impleaded as third-party defendants.[1]
 
 
 3
 The third-party complaint filed by CSB 21 sought declaratory and injunctive relief on a wide front. It sought a declaration that the third-party defendants, city, state, and federal, are engaged in a policy of affirmative action designed to perpetuate racial imbalance in public and public-aided housing, that this policy is the "basic cause for racial imbalance and segregation in the public school systems of the City", that approval of public housing project construction sites in Coney Island, in particular, perpetuates, segregated living patterns, and that the City has established a policy of separate but equal to housing and educational facilities. The specific relief requested against the third-party defendants was to direct that they act to desegregate existing public housing in the City, particularly in Coney Island, and execute plans to desegregate all presently segregated New York City public housing projects. The third-party complaint also sought a direction to the Federal and State defendants not to approve new loans and new grants to the City until its discriminatory practices have been eliminated. It finally sought an order permanently requiring to the third-party defendants to cease and desist from illegally and unconstitutionally processing and selecting in a discriminatory manner tenants' applications in public and public-aided housing.
 
 
 4
 By filing this far-reaching third-party complaint the local school board did far more than seek to set up segregative acts of other agencies as a defense for itself. It sought to charge the other agencies with full responsibility. It succeeded initially in getting the District Judge to convert a narrow issue involving a single junior high school with a capacity of about 1,000 students into what could only become an issue so broad as to defy judicial competence, a matter which would require coordinated legislative and executive action by three governments, federal, state and city, for a solution. In the words of the Supreme Court, "(o)ne vehicle can carry only a limited amount of baggage." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 22, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971).
 
 
 5
 The problem posed by the third-party complaint had at its core the intractable question of how urban slums can be rehabilitated for the benefit of people already living in the area, when they are largely from the minority group, without continuing the already existing racial population pattern. On the other hand, the dislocation of white residents, in other neighborhoods, presents problems of difficulty. And it is possible that "black" schools tend to make neighborhoods in their vicinity black as well.
 
 
 6
 As the Supreme Court said, with respect to the objective in school cases, "it does not and cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools." Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 23, 91 S.Ct. at 1279.
 
 
 7
 The District Court refused, however, to dismiss the third-party action on motion of the third-party defendants.[2] The Court determined that the third-party defendants would have to remain in the case to insure that a comprehensive remedy could be granted by the Court.
 
 
 8
 A full trial was held both on the original complaint and on the third-party complaint commencing on January 2, 1973.
 
 
 9
 On December 19, 1973, the District Court announced its decision. The Court stated that an opinion would follow, but that it had decided that the School Board and Chancellor were liable for conducting a segregated school in violation of the Constitution; and that the Court would require a Plan, effective in September, which would provide that the school population of Mark Twain not deviate more than ten percent from the average ratio of minority to white population in District # 21.
 
 
 10
 On January 28, 1974, the Court filed a 152 typewritten page decision and order accordingly. 383 F.Supp. 699 (E.D.N.Y.1974). It did not find the third-party defendants liable over for the situation at Mark Twain, "mooted" the action as to them, but retained jurisdiction over them for purposes of relief. CSB 21 filed a timely Notice of Appeal from the order on February 21, 1974, to protest the "mooting" of CSB 21's third-party complaint.
 
 
 11
 The parties were ordered to submit a plan in conformity with the decision by March 1, 1974 to be placed in operation in September, 1974. The parties submitted plans on March 1. The Court held hearings and determined to appoint a Special Master.
 
 
 12
 On April 2, 1974 the Court appointed Curtis J. Berger as Special Master, and found that "plans to deal comprehensively with conditions that have figured in the segregation of Mark Twain cannot be executed by September of 1974. Accordingly, the desegregation of Mark Twin is postponed to September, 1975."[3]
 
 
 13
 Appellants sought a reinstatement of the original September, 1974 date, but the Court adhered to its view. Appellants sought to appeal to this Court, but the appeal was dismissed on the ground that the District Court had never issued an injunction from which an appeal could be taken. 497 F.2d 1027 (1974) (Friendly, J.); see Taylor v. Board of Education, 288 F.2d 600 (2 Cir.1961).
 
 
 14
 The District Court, after the Special Master had reported in July, had before it three basic plans for desegregation of Mark Twain: 1)a plan proposed by the School Board; 2) a plan, quite similar but more detailed, by the Special Master; and 3) a plan proposed by Professor Dodson, appellants' expert on educational desegregation, who had devised several alternative plans, but favored his Model II plan.
 
 
 15
 The District Court entered a final judgment on July 26, 1974 from which this appeal has been taken. That judgment, in the form of a memorandum opinion and order, provides in summary that the plan tendered by the School Board is to be put into operation, with certain conditions added by the Court.
 
 
 16
 The plan which has been ordered will: (1) redraw the feeding patterns of the middle schools so that the incoming grade of each intermediate and junior high school, and 7th and 8th grades of K-8 schools, will reflect approximately 70% Caucasian and 30% "minority" population-which is the approximate ratio of Caucasian to minority in the school population of the district's middle schools;[4] (2) graduate the 8th and 9th grades of Mark Twain; (3) transfer Mark Twain's present 7th grade, and zone the graduating pupils of P.S. 188 and P.S. 238 (predominantly "minority" schools) to middle schools in the district other than Mark Twain; (4) establish at Mark Twain a District School for gifted and talented children-a "magnet school".[5] 383 F.Supp. at 771.
 
 
 17
 The Court itself added a proviso to the plan. The Court ordered:
 
 
 18
 "The magnet school plan will be deemed to have failed if there are not in attendance at Mark Twain-in the ratio of approximately 70-30, white to minority students-at a minimum at the beginning of the school year in September 1975, 350 students; in September 1976, 750 students; and in September 1977, 1050 students. Pursuant to the Master's recommendations, the plan will also be considered to have failed if at least 400 children have not expressed an intention to enroll in the program at Mark Twain by March 15, 1975; 800 children by March 15, 1976; and 1100 children by March 15, 1977, in order to allow for natural attrition and in order to provide adequate time for an alternative plan should failure be highly probable."
 
 
 19
 383 F.Supp. at 774.
 
 The District Court also ordered:
 
 20
 "In order to provide for an alternative plan should the 'Magnet School' concept fail, by January 1, 1975, the Chancellor, in cooperation with the School Board shall provide, in reserve, detailed proposals for new zoning and busing schedules based on 'Model II' of the proposal of Dr. Dodson.[6] The full reserve plan shall be kept up-to-date by necessary modifications based upon changes in population. Modifications shall be prepared by January 1, 1976 and by January 1, 1977 for the next succeeding school year.[7]
 
 
 21
 Id. (footnotes added.) The parties refer to the Model II plan as the "back-up plan."
 
 
 22
 The appeals now before us for decision are:[8]
 
 
 23
 (1) The plaintiffs appeal from the July 26, 1974 judgment confined to the District Court's approval of the plan to make Mark Twain a school for gifted and talented children, on the ground that the plan is constitutionally impermissible, while at the same time seeking approval by this Court of the Dodson plan (Model II), and asking that the District Court's alternative plan become operative now.
 
 
 24
 (2) CSB 21 appeals from the order of February 21, 1974, which purported to moot its third-party complaint.
 
 
 25
 (3) CSB 21 also cross-appeals from the decision holding it liable for the segregated condition of Mark Twain.
 
 
 26
 We shall start with a consideration of the cross-appeal of CSB 21 from the order holding it liable for the segregation of Mark Twain and ordering affirmative action, for the balance of the final judgment would be beyond the Court's jurisdiction if that phase of the judgment were reversed. We shall deal with the facts involved on the cross-appeal in Part I.
 
 
 27
 * We deal first with the appeal of Community School Board 21 from the determination of the District Court that the segregated nature of Mark Twain is the result of de jure as distinguished from de facto segregation.
 
 
 28
 This case, as the District Court noted, is the first school desegregation case in the City of New York to come to a federal court. Although this court early decided a northern segregation case, Taylor v. Board of Education of New Rochelle, 191 F.Supp. 181; 195 F.Supp. 231 (S.D.N.Y.) (Kaufman, then District Judge), aff'd 294 F.2d 36 (2 Cir.), cert. denied, 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), and later a case involving a preliminary injunction to register children from a single public housing complex in a particular neighborhood elementary school, Pride v. Community School Board, 482 F.2d 257 (2 Cir. 1973), and in a particular school district, 488 F.2d 321 (2 Cir. 1973), we have not been required to confront the difficult and delicate problems involved in urban school segregation in a metropolitan area, as have other federal courts with jurisdiction over the cities of Charlotte, Denver, Detroit, Grand Rapids, Kalamazoo, Emporia and Boston. In the cases arising from those urban areas, the courts were confronted with claimed segregation of entire school districts and, in the case of Detroit and Denver, for example, of an entire city.
 
 
 29
 We are not dealing here with a school system which has ever "been operated under a constitutional or statutory provision that mandated or permitted racial segregation in public education." See Keyes v. School District No. 1, 413 U.S. 189, 191, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Nor are we dealing with a school system that is alleged to be segregated now, either de jure or de facto, and which requires desegregation. There is no complaint that the schools in District 21 now operate on a dual racial system.[9]
 
 
 30
 We are dealing solely with one school, Mark Twain, which the District Court found to be segregated. That is like the situation with which District Judge Kaufman (now Chief Judge of this Court) had to deal in the landmark case of Taylor v. Board of Education of City School District of New Rochelle, supra. Judge Weinstein found that Mark Twain is not only segregated in fact, but that the segregation was caused, among other factors of state activity, by the action and inaction of the school authorities. On this basis he determined the segregation to be a de jure segregation, cognizable as state action under the equal protection clause of the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ).
 
 
 31
 CSB 21 contends that the District Court applied the wrong standard in determining whether its action or inaction created a condition of segregation. It maintains that the District Court determined that CSB 21 had violated the Constitution in spite of a finding that the Board was not racially motivated. It points to the "finding" by Judge Weinstein in his January 28, 1974 opinion on liability to the effect that the school authorities did not have "any intent or desire that Mark Twain be segregated. ... The school officials cannot be charged with racial prejudice in their official positions or with segregative design or intent." 383 F.Supp. at 721. CSB 21 urges that upon the basis of Keyes, supra, the finding that it is guilty of having caused segregation without a finding that its activity was racially motivated is reversible error.
 
 
 32
 The plaintiffs, on the contrary, contend that the Court, in holding CSB 21 constitutionally liable for creating and maintaining Mark Twain as a segregated school, used the appropriate standard. While conceding that under Keyes there is a distinction between de facto and de jure segregation, they argue that a showing that the segregation was, to a significant degree, intentionally or purposely caused or maintained by the school authorities is enough, without proof of a racially discriminatory motive.
 
 
 33
 We must turn first to the District Judge's findings to determine whether he correctly held that segregation in the constitutional sense exists at Mark Twain. We must then review his findings on what CSB 21 did or did not do to determine whether he correctly assessed their foreseeable effect in terms of de jure state action.
 
 
 34
 The District Judge found that Mark Twain is, in fact, a segregated school because of various circumstances which taken together spell segregation.
 
 
 35
 First, over the past ten years, the racial balance of the Mark Twain student body has changed drastically. In 1962 white students comprised about 81% of the total enrollment. In each of the last ten years the percentage of white students has declined. By 1973 white students comprised only about 18% of the total enrollment. On the other hand, in 1962 black students comprised about 7.4% and Hispanic students about 11.6% of the total enrollment. By 1973 blacks comprised about 43.3% and Hispanos 38.6% of the total enrollment, for a combined total of almost 82%.[10]
 
 
 36
 The judge found that this drastic change in the racial balance has been due more to the "attrition" of white students than to any influx of minority students.
 
 
 37
 Relating the Mark Twain figures to the total District enrollment in intermediate and junior high schools, he found that while the total resident enrollment of non-whites was only 17%, at Mark Twain it was 76%. Put another way, 41% of resident non-white students attended Mark Twain which was 81.9% non-white.
 
 
 38
 Second, the Court found that the facilities of Mark Twain were underutilized, which implied that a rezoning of students would normally equalize the differences in utilization among the schools of the district. The Court found that in 1962, the utilization rate had been 88%. By the fall of 1973 it was 41%. The drop in the utilization percentage was attributable almost entirely to the "attrition" of white students, who were not replaced.
 
 
 39
 Third, the Court found that there was internal segregation within the school itself as a result of the equivalent of tracking.[11] Those with high reading scores are almost all white. In contrast, those in the last three of seven categories in reading ability are almost all non-white.
 
 
 40
 Fourth, the Court found that the community and school officials view Mark Twain as a segregated school. Both experts, Professor Nathan Glaser for the School Board and Professor Dan W. Dodson for the plaintiffs, agreed. And the present Chancellor, Irving Anker, conceded that Mark Twain "was racially imbalanced."
 
 
 41
 Mere racial imbalance resulting from population shifts would not be enough to spell segregation in the constitutional sense. Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 23-24, 91 S.Ct. 1267, 28 L.Ed.2d 554. Here the underutilization, in the light of the changes in feeder patterns described below, is a significant factor.
 
 
 42
 And while we do not find the internal segregation statistics particularly meaningful as an element, cf. Bazelon, C. J., in Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175, 187-190 (1969), we are of the opinion that consideration of the other elements in combination was proper, and that it leads to an objective conclusion that Mark Twain is, in fact, a segregated school.
 
 
 43
 The next question is what made it that. While, as in many human conditions, there is likely to be no single proximate cause, the finding of a confluence of causes may allow the judicial process to sift them to determine whether state action is among them. That is what Judge Weinstein did. We shall discuss whether the standard he used was a proper one on reviewing his salient findings on state action, which were as follows.
 
 
 44
 First, Public School 212 and Public School 216 are both elementary schools with predominantly white student bodies. At one time students at both elementary schools upon graduation were sent, under school board rules and regulations, to Mark Twain.
 
 
 45
 Though until September 1965 about 50% of the graduating class of P.S. 216 was fed into Mark Twain, by September, 1966, pursuant to a change in school zoning patterns, all began feeding into J.H.S. 228 instead. This change, of course, had the foreseeable effect of decreasing the white student enrollment at Mark Twain.
 
 
 46
 In September, 1966, the predominantly white student body of P.S. 212 which had been feeding into Mark Twain, was now, by a school zoning change, fed into a recently completed junior high school, J.H.S. 281.
 
 
 47
 In September, 1965, a new school, P.S. 303 was opened in District # 21 as an elementary facility, comprised of kindergarten through sixth grade. Beginning in September, 1968, it was transformed into an Intermediate School, under the direction of the Central Board of the Board of Education. Kindergarten through grade 5 were discontinued in 1968 and in 1971; grades 7 and 8 were added in 1969 and 1970. Since Mark Twain is a grade 7 through grade 9 school, P.S. 303 came into direct competition with it.
 
 
 48
 In adding grades 7 and 8 to P.S. 303, the local school board withdrew children in the almost entirely white-occupied Warbasse Houses and Luna Park Houses from Mark Twain. The adverse racial impact was called to the attention of the board by the District Superintendent, but the board preferred to rely on estimates that planned housing soon to be built would contain enough white children to redress the racial imbalance at Mark Twain-an expectation which did not come to pass.
 
 
 49
 At the present time, the judge found, only P.S. 188 and P.S. 288 feed into Mark Twain. P.S. 188 in 1973 had a non-white enrollment of 79%. P.S. 288, during the same year, had a non-white enrollment of almost 92%. In consequence, they were feeding a largely non-white group of children into Mark Twain.
 
 The District Court concluded:
 
 50
 "The various actions of the Community Board and the predecessor local School Board described above-the rezoning effectuated with regard to Elementary School 216; the construction of J.H.S. 228 and the attendant rezoning of students graduating from Elementary School 212; and the phased conversion of P.S. 303-individually and together, had the foreseeable, inevitable effect of decreasing the white student enrollment at Mark Twain. It helped bring about the severe racial imbalance which we have already described." 383 F.Supp. at 716 (Emphasis added).
 
 
 51
 The District Court found further that the foreseeable effect was enhanced by the failure of the Community Board to act to remedy the situation. Among his subsidiary findings in this regard were the following:
 
 
 52
 First, a rezoning plan was submitted to CSB 21 by the District Superintendent and the office of school zoning of the Board of Education, under which P.S. 216 would again feed into Mark Twain. CSB 21 met with parents' associations and held a public hearing on March 31, 1971. On April 7 it announced that it would not change the status quo. On September 7, 1971 Chancellor Scribner directed CSB 21 to formulate by no later than December 31 a plan "to eliminate racial imbalance and improve building utilization" at Mark Twain.
 
 
 53
 In January 1972 CSB 21 at a public meeting announced a plan. It was "a plan to augment the junior high school program in order to encourage free choice transfers to Mark Twain. ..." Essentially the program called for spending more money to improve the quality of Mark Twain's educational program. At the same meeting an amendment was proposed to reinstate P.S. 212 and P.S. 216 as feeder schools and to have the children gather in front of these two schools, from which location they would be bused to Mark Twain. The amendment was defeated by a vote of 7 to 2.
 
 
 54
 The "free choice" plan as formulated has not succeeded in bringing white children to Mark Twain.
 
 
 55
 Second, Chancellor Scribner, in a letter of April 7, 1972 advised the Community Board that he did not think the "free choice" plan would work and ordered the Board to adopt a plan no later than May 17, 1972 to ensure that Mark Twain would have an enrollment of such a nature that (a) by September 1, 1972, the percentage of minority group students would not vary from the District average by more than 30%, (b) by the following September, by more than 20%, and (c) by September 1974 by 10%.
 
 
 56
 The Board advised the Chancellor that it would not modify its January 5th plan at that time. The Chancellor then modified his directive on July 5, 1972 to allow a sixth grade to be added to Mark Twain for September 1972. He requested that schools which would normally feed into Mark Twain observe that normal feeder pattern so that by September 1972, all students scheduled to attend another middle school as a result of options, would attend Mark Twain instead.
 
 
 57
 At trial it developed that the Chancellor had decided that a massive infusion of white students from a contiguous neighborhood into Mark Twain would not work, since those white students would transfer out of the public school system over a short period of time. These fears were far from groundless, for, as the United States Commission on Civil Rights discovered in the late 1960's, in the central cities as opposed to suburban areas, "nonpublic schools absorb a disproportionately large segment of white school-age population." Report, Racial Isolation in the Public Schools 39 (1967) as quoted at 383 F.Supp. at 721.
 
 
 58
 Further directives along the same line from the Chancellor were not followed by the Board.
 
 
 59
 The Judge recognized that the Board did zone non-white children from the area adjacent to Mark Twain into P.S. 303 instead, in spite of opposition of some white parents of children in P.S. 303, and that, as we have noted,[12] non-white children are bused into the District from Bedford-Stuyvesant. He concluded, however: "Their inaction (CSB 21 and Chancellor Scribner) had the natural and foreseeable effect of maintaining and perpetuating severe racial imbalance at Mark Twain Junior High School." 383 F.Supp. at 721. He concluded as well, nevertheless, as we have already noted, that "(t)he school officials cannot be charged with racial prejudice in their official positions or with segregative design or intent." Id.
 
 
 60
 The essential finding of the District Court is that "(d)emographic trends have been accentuated by government choices. Decisions have been made knowing that they would encourage segregation and failure to take available steps to reverse segregative tendencies have made a bad situation worse." Id. at 707. "School authorities acted and failed to act knowing segregation would be the result of their decisions." Id. at 741.
 
 
 61
 We are not dealing, under the findings below, with a case of adventitious segregation. We must determine then whether the standard applied by the District Court is sufficient to allow imposition of liability on the Community School Board to redress inequity, keeping in mind that it was also, somewhat inconsistently, the District Court's view that the school officials cannot be charged with racial prejudice in their official positions or with segregative design or intent.
 
 
 62
 We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to de facto rather than de jure segregation. Since here there has been a finding of affirmative action, coupled with intentional inaction, the case is different.
 
 
 63
 To put the issue in perspective, a summary review of the leading authorities will be helpful. The southern schools had been under statutory command to segregate. Brown I, supra, decreed an end to "separate but equal" school facilities. Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ), ordered affirmative action to be taken to remedy existing de jure segregation. In Swann v. Charlotte-Mecklenburg Board of Education, supra, the Court spoke even more strongly of the requirement of affirmative action to remedy historical de jure segregation, including the busing of students, if necessary. In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Court had made it clear that it would not tolerate "freedom of choice" plans which had not hitherto succeeded in effecting desegregation.
 
 
 64
 In Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), a city which had been part of a county school system previously found violative of the Constitution was not permitted to establish a separate school system where the effect of so doing would have been to impede the process of dismantling the segregated school system.[13] Since the Court of Appeals had found that the primary purpose of Emporia's action was " 'benign,' and was not 'merely a cover-up' for racial discrimination," the Supreme Court was required to determine whether a test looking to the "dominant purpose" of the City's action was valid. The Court held such a test both invalid and irrelevant. The Court held instead: "Thus, we have focused upon the effect-not the purpose or motivation-of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect." Id. at 462, 92 S.Ct. at 2203.
 
 
 65
 Then came the first northern school desegregation case to reach the Supreme Court. Keyes v. School District No. 1, supra. The opinion of Mr. Justice Brennan for the majority requires a closer look. Petitioners there sought desegregation of the schools in an area of Denver called Park Hill. After obtaining an order to desegregate the schools in Park Hill, they expanded their suit to secure desegregation of the remaining schools in Denver, particularly in the core city area. The District Court denied the further relief, holding that the deliberate racial segregation of the Park Hill schools did not prove a like segregation policy addressed specifically to the core city schools and requiring petitioners to prove de jure segregation for each area that they now sought to have desegregated.
 
 
 66
 The Supreme Court reversed, holding inter alia, that since a policy of intentional segregation had been proved with respect to a significant portion of the school system, the burden was on the school authorities to prove that their actions with respect to other areas of the school district were not likewise motivated.
 
 
 67
 The District Court had already made the finding that the segregation of the Park Hill schools had been the result of "an unconstitutional policy of deliberate racial segregation with respect to the Park Hill schools", which the Court of Appeals sustained. 413 U.S. at 194, 93 S.Ct. at 2690, 37 L.Ed.2d 548. And "(p)etitioners apparently concede for the purposes of this case that in the case of a school system like Denver's, where no statutory dual system has ever existed, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." 413 U.S. at 198, 93 S.Ct. at 2692. The Supreme Court was therefore concerned solely with the question of what effect the accepted finding should have on the status of the core city schools. With the concession that creation or maintenance of a dual system had to be de jure rather than de facto, there was no reason for the Supreme Court to distinguish in Keyes between intentional acts of school authorities reasonably foreseeable as effecting segregation but without specific racial motive, and acts discriminatingly racial in motive. Thus, while Mr. Justice Brennan spoke of "deliberate racial segregation" in the context of Denver, we think he was not deciding whether intentional action leading foreseeably to discrimination, but taken without racial motivation, might not also constitute de jure discrimination.
 
 
 68
 Mr. Justice Powell and Mr. Justice Douglas, though in view of the finding and concession it was not necessary to the decision, suggested that there was no longer a meaningful difference between de jure and de facto segregation. Mr. Justice Powell suggested, in effect, that what is sauce for the Southern goose is sauce for the Northern gander.
 
 
 69
 If the majority intended a sharp distinction between Southern dual systems with a history of statutory segregation, on the one hand, and de jure segregation by state action in the North, that distinction was, in our respectful opinion, not made clear. Nor was anything said to restrict the judicial methodology of Wright, which used an objective test of foreseeable effect rather than of racial motive.
 
 
 70
 There is no doubt that in the Northern cities without a statutory history of racial school segregation, there is still a valid distinction, in a constitutional sense, between de facto segregation, a condition created by factors apart from the conscious activity of government, and de jure segregation, caused or maintained by state action.[14]
 
 
 71
 The question is simply by what standard state action is to be judged, whether on the foreseeable consequences of acts or on an indispensable finding that the act or omission was racially motivated. We believe that the question has not been settled authoritatively by the Supreme Court.[15]
 
 
 72
 Unless the Supreme Court speaks to the contrary, we believe that a finding of de jure segregation may be based on actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation. The redeployment of feeder schools is an illustration. We do not think that the Supreme Court has said that intent may not be established by proof of the foreseeable effect on the segregation picture of willful acts.
 
 
 73
 To say that the foreseeable must be shown to have been actually foreseen would invite a standard almost impossible of proof save by admissions. When we consider the motivation of people constituting a school board, the task would be even harder, for we are dealing with a collective will. It is difficult enough to find the collective mind of a group of legislators. See Palmer v. Thompson, 403 U.S. 217, 224-25, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); and see Keyes v. School District No. 1, supra, 413 U.S. at 233-34, 93 S.Ct. 2686 (Powell, J., concurring). It is even harder to find the motivation of local citizens, many of whom would be as reluctant to admit that they have racial prejudice as to admit that they have no sense of humor.[16]
 
 
 74
 The more orthodox test is the objective one. In other contexts, we have enthroned the "reasonable man" as the model for human conduct in objective terms. Prima facie intent has been presumed from objective facts in employment discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the field of civil rights, we have been told that 42 U.S.C. § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). Even in finding criminal intent beyond a reasonable doubt we have, in cases involving dealings in stolen goods, for example, permitted juries to find guilt where there has been a showing that a defendant was aware of circumstances that would surely convince the average man that the goods he possessed were stolen. United States v. Jacobs, 475 F.2d 270, 280 (2 Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973).
 
 
 75
 Speaking in de jure terms does not require us, then, to limit the state activity which effectively spells segregation only to acts which are provably motivated by a desire to discriminate. See Wright v. Council of City of Emporia, supra, 407 U.S. at 461-62, 92 S.Ct. 2196. Aside from the difficulties of ferreting out a collective motive and conversely the injustice of ascribing collective will to articulate remarks of particular bigots, the nature of the "state action" takes its quality from its foreseeable effect. The Fourteenth Amendment is not meant to assess blame but to prevent injustice.[17]
 
 
 76
 We recognize that the Court of Appeals for the Ninth Circuit in Johnson v. San Francisco Unified School District, 500 F.2d 349 (1974), following its own earlier view in Soria v. Oxnard School District Board of Trustees, 488 F.2d 579 (9 Cir. 1973), cert. denied, 416 U.S. 951-52, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974) (on an appeal from a summary judgment),[18] apparently has construed Keyes "as requiring for any finding of unconstitutional segregation a 'determination that the school authorities had intentionally discriminated against minority students by practicing a deliberate policy of racial segregation.' 488 F.2d at 585." 500 F.2d at 351. It remanded to the District Court "to reexamine the record on the issue of intent," 500 F.2d at 352, but assumed, of course, that the "issue of intent" could be inferred from the evidence itself. Id.
 
 
 77
 The difference is largely semantic. The design or intent thought to be prerequisite to a de jure finding may be evidenced by the performance of acts, the foreseeable consequence of which is segregation. We believe our brethren of the Ninth Circuit, in remanding, meant no more than that the District Court should focus on and, if need be, develop evidence from which intent or lack of intent could be inferred.
 
 
 78
 The Court of Appeals for the Sixth Circuit in Oliver v. Michigan State Board of Education, has perhaps come closer to our construction of Keyes. It held:
 
 
 79
 "A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies." 508 F.2d 178, at 182 (6 Cir. 1974); cf. Higgins v. Board of Education, 508 F.2d 779 (6 Cir. 1974).
 
 
 80
 The First Circuit as well, in recently affirming Judge Garrity's decision in the Boston school case, indicated a somewhat similar reading of Keyes. Morgan v. Kerigan, 509 F.2d 580 (1974), aff'g 379 F.Supp. 410 (D.Mass.1974). There the District Court had, on various items of claimed de jure segregation, held alternatively that there was racial motivation in actions of the Board, but that proof of motivation in the face of foreseeable consequences was not required. The Court of Appeals also apparently based its affirmance on both grounds. First, the panel held that the pattern of selective action and refusal to act was consistent only when considered "against the foreseeable racial impact of such decisions." (Emphasis added). Second, it noted that this pattern had been "accompanied by statements of express intention not to counter anti-integration sentiment." Id. at pp. 588-589. The opinion hardly reflects disfavor of the natural and foreseeable consequences test.
 
 
 81
 We conclude that enough has been shown of intentional state action through the community school board and its predecessor local school board[19] to support a finding of segregative intent from the foreseeable consequences of action taken, coupled with inaction in the face of tendered choices. Instead of remanding, we treat the District Court's finding of a lack of racial motivation as irrelevant in the face of his findings of foreseeable effect.
 
 
 82
 If, after sustaining a District Court finding of de jure segregation, we failed to apply the same standards to school desegregation in the north as would be applied to de jure school segregation in the south, we would be helping to foster a two-tier nation. See Keyes v. School District No. 1, supra, 413 U.S. at 228-31, 93 S.Ct. 2686, 32 L.Ed.2d 548 (Powell, J., concurring). It is not the history of segregative practice alone which requires affirmative action to void discrimination. It is the fact of discrimination itself, if it results from state action, that violates the equal protection clause. And it is settled that local school boards are agents of the State for Fourteenth Amendment purposes. Cooper v. Aaron, 358 U.S. 1, 16, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958). We speak only in terms of de jure rather than de facto segregation, for the Supreme Court has apparently been unwilling to accede to Mr. Justice Powell's minority view that the distinction has become meaningless. Keyes v. School District No. 1, supra, 413 U.S. at 219 et seq., 93 S.Ct. 2686.
 
 
 83
 Moreover, the impact of "The Education Amendments of 1974," Pub.L.No.93-380 (Aug. 21, 1974) is still to be assessed. Title II, section 215(c), provides that once a court of competent jurisdiction has determined that a school system is desegregated, no federal court can order formulation or implementation of a new desegregation plan involving "transportation of students" to compensate for subsequent shifts in residential population that result in corresponding shifts in the composition of school populations. On its face, this section indicates that Congress intends to maintain the de jure-de facto distinction and to prohibit the use of certain judicial remedies in de facto situations. See also id., section 208.
 
 II
 
 84
 Since we agree with the District Court's finding that Mark Twain is segregated as a matter of constitutional law, due at least in part to state action, we turn to the remedy ordered by the Court, sitting as a court of equity.
 
 
 85
 The first objection of plaintiffs-appellants is to any extension of time for the desegregation of Mark Twain to September 1975. They contend that it is the constitutional obligation of school officials to come forward with a plan that "promises realistically to work now." Green v. School Board of New Kent County, supra, 391 U.S. at 439, 88 S.Ct. 1689, 20 L.Ed.2d 716. They point to the Supreme Court's obvious disdain for "stay orders," citing Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, rehearing denied, 396 U.S. 976, 90 S.Ct. 437, 24 L.Ed.2d 447 (1969).
 
 
 86
 The problem in this case is not as simple, however, as appellants would have it. The District Court did not issue a stay without more. Only after holding hearings on possible remedial plans and determining that the complexity of the problem demanded the attention of a Special Master did the District Court decide to set the new target date as September 1975. After the Master had reported, the Court gave most careful consideration to the remedies proposed and carefully evaluated the balancing of factors most likely to succeed in an ongoing desegregation of Mark Twain. Finally, the Court hedged the "magnet school" plan, which concededly will take several years for full achievement, with conditions which, if not met on schedule, would require reversion to the "Model II" plan favored by plaintiffs-appellants-the "back-up plan."
 
 
 87
 We recognize, of course, as legal truisms that the concept of "with all deliberate speed" is as outworn as racial segregation itself ought to be, Green v. County School Board, supra, 391 U.S. at 438-39, 88 S.Ct. 1689; Griffin v. County School Board, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), and that community resistance would not be sufficient justification for postponement of the plan. Brown II, supra, 349 U.S. at 300, 75 S.Ct. 753, 99 L.Ed. 1083; Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). We do not think, however, that the District Judge violated these instructions in making his decision. We are not dealing, after all, with an attack on a segregated school system, long entrenched, and long resistant to the commands of Brown I, supra.
 
 
 88
 There is something to be said for the CSB 21 argument that the change in the racial composition of the neighborhood and the flight of white students was a more effective cause of the Mark Twain situation than anything which the school board did or did not do. While we have held that the District Court's finding of de jure segregation was correct, we are also conscious of his feeling that the school board has not been racially motivated.
 
 
 89
 A solution that tries to enlist the better nature of a community in a constructive manner is not a surrender to community prejudice.
 
 
 90
 As the Supreme Court prophesied in Green v. County School Board, supra, 391 U.S. at 439, 88 S.Ct. at 1695: "There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case."
 
 
 91
 We find, as on earlier panel intimated, 497 F.2d at 1031-32, that, assuming the validity of the plan that has been decreed, the extension of its commencement by the District Court to the beginning of the next school year, September 1, 1975, is not typical of the kind of foot-dragging which the Supreme Court has found unacceptable. The extension was well within the court's discretion in the framing of remedies. See 497 F.2d at 1032, and cases cited.
 
 III
 
 92
 Appellants attack the plan decreed by the District Court, moreover, as unconstitutional and a "blatant racial solution." Although it must be clear that if the magnet plan works, it will achieve racial desegregation, the appellants nevertheless object that since the magnet plan requires busing of substantially more minority students than white students (1050 as opposed to 650), it imposes an unfair burden on minority students. They reason by analogy from cases holding that when school authorities attempt to desegregate by closing black schools and making black children alone relocate into other schools, they impose a disproportionate burden on blacks and must show that their solution was adopted for nonracial reasons. United States v. Texas Education Agency, 467 F.2d 848, 871-72 (5 Cir. 1972) (en banc); Lee v. Macon County Board of Education, 448 F.2d 746, 753-54 (5 Cir. 1971).
 
 
 93
 But in this case the "burden" of busing cast upon minority students is only a "somewhat heavier burden," as the District Court found. See Higgins v. Board of Education, supra, 508 F.2d at 793-795. A "somewhat heavier burden" has to fall somewhere, either on white or minority students as a class. Even the plan proposed by appellants allocates more of the burden to minority students. The District Court found:
 
 
 94
 "Projections supplied by the Master indicate that when the plans are fully operative, under the plaintiffs' in the order of 950 minority students will be bused out of Central and Western Coney Island and 750 white students bused in; under the 'Magnet School' plan, equivalent figures are 1050 minority and 650 mainly white. In the first year of operation the difference is appreciably greater." 383 F.Supp. at 772.
 
 
 95
 Under the circumstances, we do not find the deviation from exact mathematical equality to be of unconstitutional dimension in this case.[20]
 
 
 96
 As the Court of Appeals for the Sixth Circuit has noted recently, all reasonable attempts must be made to equalize the inconveniences among various segments of the population, but an integrated school experience is too important for the nation's children to discourage school officials from undertaking creative programs. Higgins v. Grand Rapids Board of Education, supra.[21]
 
 
 97
 The next contention of appellants is that the "magnet school" plan is not really a segregation remedy at all but is, rather, a "free choice plan." There is no doubt that in the evolution of desegregation policy, freedom of choice plans, at least in previously statutorily segregated school systems, are generally ineffective and therefore unacceptable. Green v. County School Board, supra, 391 U.S. at 439-41, 88 S.Ct. 1689. From Brown II on, the affirmative duty of school boards to root out the dual system of education has meant more than merely allowing black children into hitherto closed white schools.
 
 
 98
 Swann v. Charlotte-Mecklenburg Board of Education, supra, 402 U.S. at 15-16, 91 S.Ct. 1267, 28 L.Ed.2d 554.[22]
 
 
 99
 In this case, the magnet school plan chosen by the District Court cannot be fairly termed a "freedom of choice plan," for it is not free of coercive elements. The plan requires the shutting down of special facilities for talented and gifted children throughout the intermediate and junior high school world of District 21 except for Mark Twain. Parents who have children of the age group who are intellectually, artistically or scientifically gifted will, it is hoped, think twice before leaving the child in the doldrums of a slow pedogogical experience when there is a school-Mark Twain-available with the special curriculum and teaching interest required.
 
 
 100
 Appellants assert that the magnet plan is unacceptable. We disagree. We cannot say that there is no value in groupings of black and white children of higher achievement in an integrated setting. There is nothing in the Constitution that says that superior educational facilities for the talented are forbidden, so long as racial segregation policy plays no part.
 
 
 101
 The experts who oppose this kind of educational facility, like Dr. Kenneth Clark, fear that it may create an elite class. We, on the other hand, can see great merit in mixing white and non-white superior students. It gives the non-white as well as the white students so enrolled a chance to widen their horizons through the interplay of ideas and the absorption of diverse sub-cultural attitudes. It can become the training center for leaders of both racial groups who may someday be the leaders, non-white as well as white of our society. Elitism is not obnoxious if it is color blind.
 
 
 102
 In further opposition to the "magnet school" plan, the appellants assert that it will not work, that racial antipathies are so virulent that white parents will not choose voluntarily to send their children to what is known as a Negro school.
 
 
 103
 There is substantial evidence, however, that integrated special schools have worked in other places. In his report, the Special Master referred to successful "magnet school" programs in Providence, Rhode Island, and Boston, Massachusetts. The Master also reported that the John Dewey High School in Coney Island, organized in 1969, which offers a program that "significantly departs from the educational fare traditionally offered in the City's high schools" draws many students in District 21 from high schools closer to their residence.
 
 
 104
 In short, we agree with the Court of Appeals for the Fifth Circuit when it approved the transformation of a "black high school ... from an academic school into a fully integrated center for exceptional children." Stout v. Jefferson County Board of Education, 483 F.2d 84, 85 (1973). And we note that Congress in the new "Education Amendments of 1974," Pub.L.No.93-380, Title II, section 214(f), (Aug. 21, 1974), provides for "magnet schools" as a method of remedying denial of equal educational opportunities.
 
 
 105
 In any event, the judgment leaves room for the correction of a mistaken optimism. We hold that the time lag for reversion to appellant's "Model II" plan if the "magnet school" plan does not work is not unlawful, and is well within the limits of the District Court's discretion.[23]
 
 
 106
 Finally, appellants ask us to hold that the Chancellor's withdrawal of his April 7, 1972 directive was unconstitutional and to order that the directive be implemented. The directive ordered the Community School Board to devise and adopt a plan for desegregation of Mark Twain that would ensure that by September 1, 1974, neither the ratio of whites to minority students nor the utilization of facilities at Mark Twain would deviate by more than 10% from the comparable figures for the district as a whole. The directive was withdrawn by the Chancellor in July 1972, after a meeting with the School Board. In its opinion, the District Court noted this incident as evidence of the liability of both the Board and the Chancellor. 383 F.Supp. at 719-21. But once it had proper equitable jurisdiction, the Court was not bound to use any particular remedy. The Court carefully considered several plans, including the Model II plan, which resembles in some respects the Chancellor's directive of almost three years ago. Its approval of the School Board's plan was well within its discretionary equitable powers.
 
 IV
 
 107
 Before disposing of the appeal by the foregoing, we believe that we should also consider the position of the third-party defendants. The District Court "mooted" the case against them but kept them in the case for purposes of remedy.
 
 
 108
 The third-party defendants have not cross-appealed. The only appeal before us on the third-party complaint of CSB 21 is that of the third-party plaintiff. Yet we cannot avoid the question of the remaining jurisdiction of the District Court over the third-party defendants.
 
 
 109
 Though the District Court did not formally dismiss the third-party action it did so in practical effect when it "mooted" the action. While the judge did not define the term, it generally means that there is no longer a case or controversy within the meaning of Article III of the Constitution.
 
 
 110
 The determination that the Community School Board and the Chancellor are liable is, in the light of the pleadings and mode of trial, a finding that the third-party defendants are not liable because of their housing policies. The form of the decree, requiring no affirmative action in the housing field, except the filing of monthly progress reports, further supports that view.
 
 
 111
 To say that the case has become moot generally means that the defendant is entitled to a dismissal as a matter of right. See United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); N.L.R.B. v. General Motors Corp., 179 F.2d 221 (2 Cir. 1950).
 
 
 112
 None of the third-party defendants has objected to staying with the case, however, on the view that some coordinated action may be helpful in the future. We commend the spirit of these public officials, but we find it hard to see why a federal district judge should superintend so vast a series of continuing enterprises and be in a position to interpose a remedy whenever he does not agree with the voluntary action undertaken by appropriate public bodies.
 
 
 113
 The Court could become involved in what would hardly be a "case or controversy" in the accepted constitutional sense, or even a proper exercise of continuing affirmative chancery jurisdiction in the English non-constitutional sense.[24]
 
 
 114
 Rather than reverse the retention of jurisdiction over the third-party defendants in the absence of a cross-appeal seeking such relief, however, we recommend to the District Court that it withdraw its decision to "moot" the third-party action and dismiss it.[25]
 
 
 115
 It may, of course, call upon city, state and federal authorities for help on a voluntary basis.
 
 
 116
 Affirmed.
 
 
 
 [1]
 The third-party defendants are: a) New York City: the Mayor; the Housing and Development Administration and its Administrator; the New York City Housing Authority and its Chairman. b) New York State: the Urban Development Corporation and its President; the Division of Housing and Community Renewal, Executive Department, and its Commissioner. c) United States: the Secretary and New York Area Regional Administrator of the Department of Housing and Urban Development ("HUD")
 
 
 [2]
 The District Court acknowledged that impleader under F.R.Civ.P. 14(a) normally requires that the impleaded party be legally liable to the main defendant, but found that the housing authorities, although not literally "liable to" the school authorities for all or part of the plaintiffs' claim, were "partly 'liable for' the harm, in the sense that their actions help maintain segregated schools." He relied in part on Bradley v. Milliken, 484 F.2d 215, 251 (6 Cir.1973), which was later reversed by the Supreme Court, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069, at page 1078 (1974). Since the third party defendants have not pressed an appeal, we find it unnecessary to consider the correctness of the court's ruling
 
 
 [3]
 In deciding on the appointment of a Special Master, the District Court acknowledged that "it is apparent that a complete and integrated proposal covering education, housing and related matters has not yet been formulated." 383 F.Supp. at 758
 
 
 [4]
 Junior high schools are comprised of grades 7 through 9; intermediate schools of grades 6 through 8 or 9; and K-8 schools of kindergarten through grade 8
 
 
 [5]
 The text of the School Board resolution relating to this phase of the plan follows verbatim:
 "III. Establish at Mark Twain a District School for Gifted and Talented Children
 "A) Entrance by application and selection only.
 "B) Admit only pupils who are graduating from elementary schools and would normally attend junior high school or intermediate schools in District 21. Students in the 6th grade of K-8 schools shall be eligible. Those students accepted for the program leaving 6th grade to go into 7th grade at Mark Twain. Those students accepted for the program leaving 5th grade to go into 6th grade at Mark Twain.
 "C) Original group to be about 333 pupils or more.
 "D) Approximate ratio of 70% Caucasian, 30% "Minority" to be adhered to at Mark Twain School for Gifted and Talented Children.
 "E) No new SP or SPE programs will be organized henceforth in any school in the district. (Existing programs will continue to graduation).
 "F) Parents will have the right to have the gifted and talented child returned to his zoned school immediately for any reason."
 
 
 [6]
 The Model II plan focuses on the use of busing to equalize utilization of all the middle schools in the district and to bring the ratio of white to minority students within each school into general alignment with the ratio within the district as a whole. Under this plan, the burden of being bused is allocated more evenly between white and minority students than under the School Board's plan, although minority students would still be bused more than whites. See 383 F.Supp. at 772
 
 
 [7]
 The Court also ordered all parties, including the third-party defendants, to submit monthly reports beginning on September 30, 1974, "indicating what progress has been made to date and what problems, if any, have arisen."
 
 
 [8]
 The following positions were taken by the parties to this action on appeal: a) The Chancellor of the City Board of Education filed a brief in support of the Community School Board plan. It does not address itself to the order "mooting" or dismissing the third-party action. b) The city of New York urges that the District Court did not abuse its discretion in refusing to order HDA and the other housing defendants to follow a specific housing plan. c) HUD filed a brief urging that the District Court properly adjudged the third-party complaint as moot. d) The State agencies similarly urge affirmance upon the cross-appeal by the CSB 21. e) Intervention was allowed by the District Court on June 14, 1974 of certain persons, as a separate class, consisting of parents with children in Mark Twain or about to go there who reside on Coney Island sites designated for urban renewal. These intervenors have filed a brief urging affirmance on the cross-appeal of the school board
 
 
 [9]
 Indeed, District 21 permits "open enrollment" in the intermediate and junior high schools of the district by students who live outside the district. These are largely black and Puerto Rican students from the Bedford-Stuyvesant section. By being allowed to cross district lines, they are able to find a school more racially balanced than if they were compelled to remain in Bedford-Stuyvesant. By October, 1972, such students comprised more than 10% of the total enrollment
 
 
 [10]
 We have been instructed that in evaluating racial discrimination we are to group Negroes and Hispanos together as contrasted with whites. Keyes v. School District No. 1, supra, 413 U.S. at 195-98, 93 S.Ct. 2686
 
 
 [11]
 Tracking is grouping students into classes within a school on the basis of their achievement level. It has been used in newly desegregated schools to perpetuate racial separation. See United States Commission on Civil Rights, Racial Isolation in the Public Schools 161-62 (1967), as cited in the opinion below, 383 F.Supp. at 740
 
 
 [12]
 See footnote 9, supra
 
 
 [13]
 See also United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972)
 
 
 [14]
 In Spencer v. Kugler, 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972), the Supreme Court affirmed the decision of a three-judge statutory court, which, following Swann, see note 22 infra, had used the de facto-de jure distinction in declining to correct segregation in public schools where there was no action of state authorities. 326 F.Supp. 1235, 1242 (D.N.J.1971). But cf. Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 147-49 (5 Cir. 1972), cert. denied, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044, rehearing denied, 414 U.S. 881, 94 S.Ct. 31, 38 L.Ed.2d 129 (1973)
 
 
 [15]
 As Justice Frankfurter commented in Gomillion v. Lightfoot, 364 U.S. 339, 343-44, 81 S.Ct. 125, 128, 5 L.Ed.2d 110 (1960): "Particularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts."
 
 
 [16]
 An early distinction between the effect of the Board's action and the Board's subjective purpose was made by Mr. Justice Stewart (then Circuit Judge) in Clemons v. Board of Education of Hillsboro, 228 F.2d 853, 859 (6 Cir.), cert. denied, 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956)
 
 
 [17]
 We used the "effect" test in Pride v. Community School Board, supra, 482 F.2d at 265, where we held, following Wright, that "a plaintiff alleging unlawful discrimination in violation of the equal protection clause of the Fourteenth Amendment is not required to prove that a discriminatory motive preceded the unlawful effect." (Timbers, J.)
 
 
 [18]
 In Soria, the Court of Appeals said: "The function of this Court is not to determine whether there is sufficient evidence from which the requisite intent and cause of segregated schools can be deduced when there are no explicit findings on these questions and the parties raise contradictory inferences from the facts." 488 F.2d at 588
 
 
 [19]
 Before September, 1970, the local school board shared much of its responsibility for structuring the education institutions of District 21 with the Central Board of the Board of Education. After that date, the Board of Education was decentralized, and the Community School Board assumed major responsibility for the district
 
 
 [20]
 We are not concerned with Section 256 of the "Education Amendments of 1974" P.L. 93-380 (Aug. 21, 1974) which provides that "after June 30, 1974 no court of the United States shall order the implementation of any plan to remedy a finding of de jure segregation which involves the transportation of students, unless the court first finds that all alternative remedies are inadequate." The only alternative plan offered to the Court was the Dodson Model II plan, which demands more busing than the remedy adopted by the Court
 We note that Congress made section 256 retroactive to June 30, 1974, before the date of its enactment, August 21, 1974. Since no plan not involving busing was presented to the District Court, we express no opinion on whether the Congressional provision would otherwise have found the District Court, which entered its order on July 26, 1974 before the enactment.
 
 
 [21]
 In Higgins, the Court of Appeals held that one-way busing of black inner-city students to peripheral areas in order to mitigate the effects of "white flight" from the public school system did not unconstitutionally place a greater burden on black children than on white children. 508 F.2d at 793-795 (6 Cir. 1974). We have no such issue here. The busing required is by no means onesided
 
 
 [22]
 In Swann, the Supreme Court also found inapplicable in the context of de jure segregation a Congressional statute which seemed to bar reassignment of students or busing to achieve racial balance. Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c et seq., authorizes the Attorney General to sue for desegregation of schools. Section 2000c(b), defining "desegregation," reads in part, " 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance." Section 2000c-6 states that nothing in the Title shall empower a federal official or court to issue any order requiring "transportation of pupils" to achieve racial balance "or otherwise enlarge the existing power of the court...." The Court construed the statutory language and the legislative history to indicate that Congress wished only to ensure that Title IV could not be "read as creating a right of action under the Fourteenth Amendment in the situation of so-called 'de jure segregation.' " The traditional equitable powers of a federal court to correct violations of the Fourteenth Amendment by state authorities remained intact. Swann, supra, 402 U.S. at 16-18, 91 S.Ct. at 1277
 
 
 [23]
 The District Court ordered the Chancellor and the School Board to develop by January 1, 1975 detailed proposals for rezoning and busing schedules based on Dodson's "Model II" plan in case the magnet school plan failed. The proposals were to be updated as population shifted, and modified on January 1st of 1976 and of 1977. Thus, if the school authorities at any time fail to meet the schedule specified for implementation of the magnet school plan, see supra, the Model II plan may be put into effect
 
 
 [24]
 The District Judge himself finally acknowledged, after the Special Master had reported, that "the decretal tool is poorly designed for restructuring an entire community." 383 F.Supp. at 775
 
 
 [25]
 In Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974), in commenting on an inter-district remedy too large in scope, the Supreme Court predicted that "the District Court will become, first, a de facto 'legislative authority' to resolve these complex questions, and then the 'school superintendent' for the entire area."