George ARTHUR et al.,
Plaintiffs-Appellees,

v.

Ewald P. NYQUIST et al.,
Defendants-Appellants.

Nos. 12–18, 203, Dockets 76–7292, 76–7391, 76–7449, 76–7450, 76–7461, 76–7485, 76–7506 and 77–7136.

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1977.

Decided March 8, 1978.

Leslie G. Foschio, Corp. Counsel, Buffalo, N. Y., Anthony Gregory, Asst. Corp. Counsel, and Patricia A. Pancoe, City of Buffalo Law Department, Buffalo, of counsel, for defendants-appellants Buffalo Board of Ed. and Members of the Buffalo Common Council, and Joseph E. Manch and Eugene T. Reville, Superintendent.

David Blasband, Linden & Deutsch, New York City, for defendants-appellants Mem-

bers of the Board of Regents of the University of the State of New York.

Jean M. Coon, Asst. Sol. Gen., Albany, N. Y. (Louis J. Lefkowitz, Atty. Gen. of State of New York, Ruth Kessler Toch, Sol. Gen., Albany, N. Y., and Eugene A. Panfil, Asst. Atty. Gen., Buffalo, N. Y., of counsel), for defendants-appellants Nyquist, Bd. of Regents, Black, Pforzheimer, Allan, Clark, Newcomb, Batista and Chodos.

Richard F. Griffin, Buffalo, N. Y., Norman Siegel, New York Civil Liberties Union, New York City, and William L. Taylor, Catholic University Law School, Washington, D. C., of counsel, for plaintiffs-appellees.

Before KAUFMAN, Chief Judge, and SMITH and MULLIGAN, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The Commissioner of Education of the State of New York, the members of the Board of Regents of the State of New York, the Superintendent of Schools of the City of Buffalo, and the members of the Board of Education and the Common Council of the City of Buffalo appeal from a judgment of the United States District Court for the Western District of New York, John T. Curtin, *Chief Judge,* finding them liable for "intentionally causing and maintaining a segregated school system" in violation of the equal protection clause of the fourteenth amendment and 42 U.S.C. § 1983. *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976).

The appellants raise a number of discrete issues on this appeal, foremost among them, the following:

(1) Whether the district court had subject matter jurisdiction over this suit;

(2) Whether the district court abused its discretion in permitting the addition of the individual members of the Buffalo Board of Education and the New York State Board of Regents, in their official capacities, as well as the newly appointed Buffalo Superintendent of Schools, as parties defendant in this suit;

(3) Whether the district court applied the proper legal standard in determining that the appellants intentionally segregated the Buffalo school system;

(4) Whether the appellees presented sufficient evidence to demonstrate that the city or state appellants were responsible for unlawful segregative acts;

(5) Whether the district court erred in instructing the state appellants to devise a remedial plan involving suburban schools;

(6) Whether it was erroneous for the district court to consider evidence related to discrimination in housing patterns in the Buffalo area.

We have determined that the district court had subject matter jurisdiction over this suit, and personal jurisdiction over the appellants. It understood and used the proper legal standard in determining whether intentional segregation was practiced. We have examined the record and find that it contains sufficient evidence to warrant the court's finding that the city appellants are liable for unlawful segregative acts. There is, however, insufficient evidence to warrant a finding of liability on the part of the state appellants. Accordingly, we affirm the judgment of the district court with respect to the Buffalo Superintendent of Schools and the members of the Buffalo Board of Education, and Common Council, in their official capacities, and we reverse its judgment with respect to the New York State Commissioner of Education and the members of the State Board of Regents, in their official capacities.

*History of the Case*

Parents of a number of Buffalo schoolchildren, the Citizens Council for Human Relations, and the NAACP, Buffalo Branch, brought this class action suit against state and city authorities alleging the creation, maintenance, and perpetuation of segregated schools in Buffalo, New York. They filed their initial complaint in this action in June, 1972, and later successfully moved to add as defendants the Mayor of the City of Buffalo and members of its Common Council.

Following the filing of a joint stipulation of facts, trial was held before Chief Judge John T. Curtin in October, 1974. In April, 1976, appellees moved to add as parties defendant the newly appointed Superintendent of Schools, members of the Buffalo Board of Education, and members of the Board of Regents.

On April 30, 1976, Judge Curtin granted the appellees' motion, and simultaneously issued the Decision and Order which found state and city appellants liable for intentional racial discrimination. 415 F.Supp. 904 (W.D.N.Y.1976). Remedy hearings were held in June, 1976, and a preliminary remedial Decision and Order was issued on July 9 of that year. Motion to reconsider the April 30 decision was denied, and the state and city parties filed notices of appeal.[1]

On the following December 14, however, Judge Curtin directed all parties to brief the United States Supreme court's opinions in *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), as they might impinge on the instant case. On March 1, 1977, in response to a motion made by city appellants, Judge Curtin filed a Supplementary Decision and Order reconsidering and affirming the Decision and Order of April 30, 1976. 429 F.Supp. 206 (W.D.N.Y.1977).

Appeal is taken from the district court's finding of liability, remedial order, and reaffirmation of the appellants' liability.

*Jurisdiction*

Appellants argue here that the district court lacked jurisdiction over this action, for the suit was in reality brought against governmental entities which are not "persons" within the meaning of 42 U.S.C. § 1983. They argue, further, that the court erred in adding as defendants individual

members of the Buffalo Board of Education and the New York State Board of Regents. These conclusions follow from three central premises: (1) liability under § 1983 is "personal," and the officials sued were, for the most part, not members of the respective boards at the time of the alleged constitutional violations; (2) the addition of parties defendant following the conclusion of trial violates the due process rights of these individuals, for they were unable to be heard to defend themselves against the charge of unlawful behavior; and (3) the proof at trial was directed at state and city boards, entities which cannot be found liable under § 1983. Substitution of individual members for governmental entities is, it is alleged, a mere sham in this case, and hence insufficient to cure jurisdictional defects.

■ We believe to the contrary that the district court did have subject matter jurisdiction in this case. The appellees brought this action pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3).

Section 1983 provides:

Every person who, under color of any statute . . . of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The United States Supreme Court has construed the term "person" in § 1983 narrowly, holding that municipalities are immune from suit under the statute. And this is true both in damage actions and when injunctive relief is sought. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d

---

1. The state appellants' motion to reconsider was denied on August 17, 1976. Memorandum decision reported at 426 F.Supp. 191 (W.D.N.Y. 1976). Appellees were awarded interim attor-

ney fees. 426 F.Supp. 194 (W.D.N.Y.1977). Appellees' motion to dismiss the City's appeal was denied on November 8, 1976. 547 F.2d 7 (2d Cir. 1976).

492 (1961).[2] These holdings have been gradually expanded so as to exempt other kinds of municipal entities,[3] states, and counties.

The Supreme Court has not yet addressed the issue of whether school boards are "persons" within the meaning of § 1983. *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 279, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This court, however, has held that they are not to be so construed. *Monell v. Department of Social Services of the City of New York*, 532 F.2d 259 (2d Cir. 1976), *cert. granted*, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977).[4] Whether state agencies, like the Board of Regents, are "persons," is a more difficult matter to ascertain, and must be considered on a case by case basis. See, e. g. *Forman v. Community Services, Inc.*, 500 F.2d 1246 (2d Cir. 1974), *rev'd on other grounds sub nom. United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975); 1 *Moore's Federal Practice* ¶ 0.62[9] n.24. But however this may be, the eleventh amendment to the United States Constitution acts as an independent impediment to suits against the states and their agencies. See *Mount Healthy City School District Board of Education v. Doyle, supra*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471; *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

While municipal school boards and state boards of regents may be exempt from suit under § 1983, their members, sued in their official capacities, are not. Thus it is set-tled law in this circuit that "municipal and state officials, sued in their official capacities, are 'persons' within the meaning of § 1983 when they are sued for injunctive or declaratory relief." *Monell, supra*, 532 F.2d at 264.

In the case of states and their component agencies [5] which are protected by the eleventh amendment as well as by § 1983, the Supreme Court has permitted suit against state officials and employees of state agencies since as early as 1908 in its opinion in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There the Court created the legal fiction that a state officer who violates the federal constitution acts under color of state law, bringing his unlawful action within the purview of § 1983, but at the same time loses his status as a state official, and hence the protection of the eleventh amendment. While the Court's analysis may not be conceptually clear, and indeed may even be internally contradictory, it has been the case since *Ex Parte Young* that suits against state officials for equitable relief restraining unconstitutional conduct have usually been entertained by the federal courts.[6] An analogous fiction sustains claims against city officials and members of city boards and agencies when equitable relief is sought under § 1983.

Appellants, however, do not abandon the argument at this point. Rather they press it to its logical limit by arguing that the individuation which is required to avoid eleventh amendment and § 1983 limitations

---

**2.** Neither are municipalities subject to suit on the theory that they are liable under 42 U.S.C. § 1988 when in violation of provisions of state law. See *Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1972).

**3.** See, e. g., *Ybarra v. City of the Town of Los Altos Hills*, 503 F.2d 250 (9th Cir. 1974) (town); *Jorden v. Metropolitan Utilities District*, 498 F.2d 514 (8th Cir. 1974) (utilities district); *Mahaley v. Cuyahoga Metropolitan Housing Authority*, 500 F.2d 1087 (6th Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975) (housing authority).

**4.** Other circuit courts have disagreed with this conclusion. See, e. g., *Keckeisen v. Independent School District*, 509 F.2d 1062 (8th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975); *Aurora Education Association East v. Board of Education*, 490 F.2d 431 (7th Cir.), *cert. denied*, 416 U.S. 985, 94 S.Ct. 2388, 40 L.Ed.2d 762 (1974).

**5.** And individuals who are sued as surrogates for the state, but not component parts of the state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**6.** When an equitable claim lodged against an official is equivalent to a claim seeking funds from the state treasury, it is barred as, in reality, a suit against the state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

on subject matter jurisdiction also governs liability under the statute. Since most board members did not assume office until after the discriminatory events alleged at trial, and since board members were joined as parties defendant only after the conclusion of the trial, appellants argue that they cannot, strictly speaking, be liable, and that the court has no jurisdiction as to them.

In support of the contention that liability under § 1983 is to be construed as strictly personal, appellants cite *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), and a number of related cases which hold that the doctrine of *respondeat superior* is not applicable to the determination of a defendant's liability under § 1983. They assert that these cases demonstrate that to be subject to the court's jurisdiction, and liable under the statute, an official must be personally responsible for the unconstitutional acts complained of by the parties plaintiff.

To the extent that the argument advanced by the appellants exploits the fiction created in *Ex Parte Young*, it is both novel and intriguing. Further examination shows, however, that it cannot be sustained on its merits.

Discussion of subject matter jurisdiction and liability under § 1983 implicates three different types of entities: (1) corporate bodies understood as collective units; (2) constituent members of those corporate bodies in their corporate or representative capacities; and (3) constituent members of those corporate bodies in their personal or individual capacities. The first two of these categories are, for most jurisprudential purposes, interchangeable. Just as any complex entity can be viewed either from the aspect of its entirety or from the aspect of its component parts, the same is true of government boards and agencies. To speak, then, of board members in their official, or corporate, capacity is to speak more of placeholders or ciphers than of living persons. And to impute liability to such a board member is not to impugn any particular office holder, but rather—in a sense—the office itself. If liability can be said to

attach to a particular person by reason of his assuming office, then it must equally be said to dissolve when that person leaves office.

By contrast, board members in their individual capacities are specific, identifiable individuals who are legally significant apart from any office which they may, from time to time, hold. Liability which attaches to such an individual must attach by reason of what he, himself, did or failed to do and not by reason of his assumption of office.

While not always explicitly, the Supreme Court has at least implicitly recognized this tripartite classification. Thus while the Court distinguishes between states as corporate entities and their officials for purposes of establishing the *Ex Parte Young* doctrine, it also distinguishes between officials in their representative and individual capacities. This can be seen in the Court's recognition that suits against officials in their representative capacity are only sometimes legally equivalent to suits against government bodies, *Edelman v. Jordan, supra*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, and in the simultaneous recognition that some suits against officials, *e. g.*, suits for intentional tortious interference with constitutional rights, warrant monetary damages assessed against the *individuals* personally involved despite the fact that they are officials. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In the latter case, the Court recognizes the existence and potential personal liability of state officials sued for damages in their individual capacities.

Appellants in the instant case would have us merge the latter two of these three categories, thereby adopting a strong requirement of individuality, both for purposes of establishing subject matter jurisdiction and for proving liability under the statute. We decline this invitation, however, both because it is jurisprudentially unsound, and because it is productive of practical absurdities.

Appellees seek declaratory and injunctive relief against members of the Board of Education and Board of Regents *in their*

*official capacities only.* Such an action is not barred as equivalent to a suit against the boards under the doctrine of *Edelman v. Jordan, supra,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, and *Monell v. Department of Social Services of the City of New York, supra,* 532 F.2d 259, nor is it equivalent to a damage action brought against the officials as individuals under *Scheuer v. Rhodes, supra,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. Rather, it falls squarely within the second category noted above. The individuals sued as officials merely stand in place of the board they comprise. The board and its members comprise the same entity viewed from different perspectives; thus they are freely interchangeable, for jurisprudential purposes, before, during and after trial. On this view, then, it is misleading to think of the various board members as parties defendant added after the close of trial. The better view is that the judge's order merely substitutes equivalent parties, different in name but identical in fact.[7]

*Rizzo* and other cases cited by the appellants for the proposition that § 1983 requires strictly individuated proof are not in point. Indeed *Rizzo* distinguishes and approves school desegregation cases in which no such theory of individuated jurisdiction or liability was apparently advanced.[8]

Any other result would be insupportable, for it would lead to the conclusion that

merely by electing new members to a board of education each time a civil rights suit was lodged, a community could perpetuate unlawful segregation by immunizing its officials from suit under § 1983. We do not believe that this was the intention of Congress in passing anti-segregation legislation, or of the Supreme Court in interpreting it.[9] Appellants are properly before the court for determination of the legality of their past actions and the propriety of relief addressed to their future actions.

### Segregative Intent

Appellants urge that the district court used an erroneous legal standard in determining that city and state officials acted with segregative intent. To understand the nature of this argument, it is necessary briefly to review the Supreme Court's major holdings in the area of school desegregation.

■ In *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court overruled the "separate-but-equal" doctrine first announced in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), holding that government-mandated racial segregation of public schools represents a violation of the equal protection clause of the fourteenth amendment. The Court, however, was unclear as

---

7. These considerations are limited, of course, to actions seeking injunctive or declaratory relief when that relief is not equivalent to an action for damages brought against the state or city boards.

Compare *Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir. 1974); *Adamian v. University of Nevada,* 359 F.Supp. 825, 827–28, 834–35 (D.Nev.1973), *rev'd on other grounds sub nom. Adamian v. Jacobsen,* 523 F.2d 929 (9th Cir. 1975).

Even if board members are construed as parties defendant added after the close of trial, such amendment and substitution are permitted, when equity requires, by Fed.R.Civ.P. 15(c) and 21. See 3 *Moore's Federal Practice* ¶¶ 15.-08[5], 15.15[4.—1]; 3A *Moore's Federal Practice* ¶ 21.04.

8. See also *City of Charlotte v. Local 660, Int'l Ass'n of Firefighters,* 426 U.S. 283 at 284 n. 1, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976) (§ 1983

action against members of city council in addition to council itself sufficient to give jurisdiction under 28 U.S.C. § 1343); *Bishop v. Wood,* 426 U.S. 341 at 343 n. 1, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (§ 1983 action brought against former City Manager and Chief of Police sufficient to give jurisdiction under 28 U.S.C. § 1343;) *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572 at 579 n. 6, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976) (complaint amended to add individual members of the board as parties defendant bringing case within § 1343 jurisdiction).

9. It may also be possible to rest jurisdiction over the Board of Education and the Board of Regents, as corporate entities, directly under the fourteenth amendment and 28 U.S.C. § 1331. See *Gentile v. Wallen,* 562 F.2d 193 (2d Cir. 1977). Our decision today does not rely on this theory, however.

to the particular source of the unlawfulness. *Brown* can be read to condemn segregated schools because they are "inherently unequal." On this reading, the source of the racial segregation is constitutionally irrelevant.[10] Alternatively, *Brown* can be read to condemn only that racial segregation which is caused by intentional discrimination on the part of state officials.[11] Ultimately, this ambiguity was clarified in a series of cases [12] which culminated in *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), a case which, for the first time, treated racial imbalance in the context of a northern school system which had no history of statutorily authorized school segregation. In *Keyes*, the Court held that only *de jure* segregation—"a current condition of segregation resulting from intentional state action directed specifically [at] the [segregated] schools"—was constitutionally impermissible. *De facto*, or adventitious, segregation was found to be lawful, and hence not a proper predicate for enforced remedial action. While the distinction between *de jure* and *de facto* segregation has been questioned both by the courts [13] and by the academy,[14] the Supreme Court has firmly adhered to the view that only *de jure* segregation violates the Constitution. See *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Austin Independent School District v. United States*, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976) (per curiam), vacating and remanding *United States v. Texas Education Agency*, 532 F.2d 380 (5th Cir. 1976); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Thus, to succeed at trial, a plaintiff must be able to show that school officials purposefully or intentionally acted to segregate students. If such segregation is merely the effect of an otherwise racially neutral policy it is insufficient to make out a valid constitutional claim.

But while it is clear that the Supreme Court requires *de jure* or intentional segregation, it is also the case that the Court has provided little in the way of elucidation of this concept. Thus a number of divergent views on the meaning of "segregative intent" have developed, which range from the highly subjective to the highly objective. See, Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction*, 86 Yale L.J. 317 (1976).

In our opinion in *Hart v. Community School Board of Education*, 512 F.2d 37 (2d Cir. 1975), this court sought to strike a balance between competing views of "segregative intent" by extracting from those views that which we found conceptually defensible, and at the same time that which was consistent with the Supreme Court's constitutional mandate. In *Hart*, we held that a finding of *de jure* segregation could be based on acts of omission or commission undertaken by governmental authorities, which have the "natural and foreseeable consequence of causing educational segregation."

---

10. See, *e. g., Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142, 148 (5th Cir. 1972), *cert. denied*, 413 U.S. 920, 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 (1973) (*en banc*); *United States v. Jefferson County Board of Education*, 372 F.2d 836 (5th Cir. 1966), *reaffirmed and modified en banc*, 380 F.2d 385, 397–98 (5th Cir.) (Gewin, J., dissenting), *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

11. See, *e. g., Deal v. Cincinatti Board of Education*, 369 F.2d 55 (6th Cir. 1966), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967).

12. See, *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

13. *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, at 216 (Douglas, J., concurring), 219–37, 93 S.Ct. 2686, 37 L.Ed.2d 548 (Powell, J., concurring in part and dissenting in part (1973)); *Cisneros, supra*, 467 F.2d at 147–48.

14. Fiss, *Racial Imbalance in the Public Schools: The Constitutional Concepts*, 78 Harv.L.Rev. 564 (1965); Goodman, *De Facto School Segregation: A Constitutional and Empirical Analysis*, 60 Calif.L.Rev. 275 (1972).

We took note of the Supreme Court's recognition of the difficulty of applying a subjective standard of proof in this area. See *Hart v. Community School District Board of Education, supra*, 512 F.2d at 50 citing *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971) and *Keyes v. School District No. 1, Denver, Colorado, supra*, 413 U.S. at 233–34, 93 S.Ct. 2686. See also, *Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 264–68, 97 S.Ct. 555; *Washington v. Davis, supra*, 426 U.S. at 253–54, 96 S.Ct. 2040 (Stevens, J., concurring); *Wright v. Council of the City of Emporia*, 407 U.S. 451 at 461–62, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). And we cited with approval the opinion of the Court of Appeals for the Sixth Circuit in *Oliver v. Michigan State Board of Education*, 508 F.2d 178 at 182 (6th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975):

A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively establish that their action or inaction was a consistent and resolute application of racially neutral policies. [Citations omitted.]

See also *NAACP v. Lansing Board of Education*, 559 F.2d 1042 (6th Cir.), *cert. denied*, —— U.S. ——, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977), which reaffirms the Sixth Circuit's holding in *Oliver*.

In *Hart*, we rejected a purely subjective standard of proof because we were unable to make good sense of the notion of a "collective will" which "intends" a certain outcome, and because of the "injustice of ascribing collective will to articulate re-marks of particular bigots," *Hart, supra*, 512 F.2d at 50. We also noted the very difficult problems of proof inherent in the adoption of a subjective definition of "intent."

At the same time, we avoided espousing a purely objective test of intention, for such a view would be excessively broad, bringing virtually all racial imbalance within the rubric of *de jure* segregation.[15] Furthermore, mere foreseeability cannot be identified with intention, for there are surely many cases in which events are both known to be likely, but nevertheless not intended.[16]

In *Hart*, we steered a course between objective and subjective theories of segregative intent by holding that foreseeable consequences, while not specifically identifiable with intention, can provide evidence for its presence. See *Hart, supra*, 512 F.2d 50, 51. Hence our approval of the Sixth Circuit's opinion in *Oliver*, which indicated that foreseeable results created a presumption of segregative intent which could be rebutted by a showing that state actions were consistent with racially neutral policies. Furthermore, we stressed that segregative intent could only be inferred in the context of an examination of alternative policies available to state officials. *Hart, supra*, 512 F.2d at 51.

In adopting this approach, we focused not on the mental processes of a changing group of school board members, but rather on the actions taken by the board itself. When such actions have the "natural, probable, and foreseeable result of increasing or perpetuating segregation," a presumption of segregative purpose is created. The burden of proof then shifts to defendant officials to show that the pattern of actions taken by those officials can be explained in a manner consistent with the

---

15. Since most racial imbalance, once established, is foreseeable, any policy which permits such imbalance to continue would, on a strictly objective theory, amount to *de jure* segregation. We believe that such a theory sweeps more broadly than necessary, collapsing the distinction between *de jure* and *de facto* segregation.

16. A surgeon will operate on a patient knowing that the patient is likely to die despite his best efforts. While the patient's death can be foreseen, it would be inappropriate to say that the surgeon "intended" to bring about the patient's death. See P. Fitzgerald, *Salmond, On Jurisprudence*, at 368–69 (12th ed. 1966).

absence of segregative intent. Put differently, once the burden of proof has shifted, school officials must be able to demonstrate that no reasonable alternative policy would have achieved the same permissible educational goals with less segregative effect. When such a showing cannot be made, it is entirely reasonable to infer that the officials acted with unlawful segregative intent.[17]

In the instant case, appellants argue that the Supreme Court's vacation and remand of *United States v. Texas Education Agency, supra,* 532 F.2d 380,[18] a case which employs a "foreseeable consequences" test similar to our own, must be taken to implicitly criticize *Hart* as well. We do not agree. The reasoning which underlies the remand of *United States v. Texas Education Agency* is not clear from the Court's one-line per curiam opinion. Justice Powell's concurring opinion appears to locate the lower court's error in its readiness to infer segregative intent exclusively from the use of neighborhood schools. 429 U.S. at 991–92, 97 S.Ct. 517. But this does not apparently challenge the standard used to infer segregative intent, as much as its particular application in that case. Furthermore, Justice Powell appears to approve of the inference of segregative intent from other findings made by the district court. See 429 U.S. at 991–92, n. 1, 97 S.Ct. 517.

In *Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, the Court lists a number of factors, not intended to be exhaustive, which can provide evidentiary support for a finding of segregative intent. These factors[19] do not, however, appear to be in any way inconsistent with the analysis developed in *Hart.* See also *Washington v. Davis, supra,* 426 U.S. at 253, 96 S.Ct. 2040 (Stevens, J., concurring).

In sum, then, we believe that the *Hart* test remains valid even after the Supreme Court's opinions in *Washington v. Davis, Arlington Heights v. Metropolitan Housing Development Corp.,* and *Austin Independent School District v. United States.* We find that it is a cogent application of the Supreme Court's requirement of proof of segregative intent, that it avoids conceptual pitfalls inherent in alternative approaches, and that it provides a method of proof which is fair to both plaintiffs and defendants in cases of alleged unlawful racial segregation.

We have reviewed the district court's opinions of April 30, 1976 and March 1, 1977, and find that the court acknowledged the Supreme Court's requirement of a finding of segregative intent, properly interpreting that requirement in light of our opinion in *Hart.* It follows that the appellants' contention that the court applied an erroneous legal standard is without merit.

### The City Appellants

The members of the Buffalo Board of Education, present and former Buffalo school superintendents, and the members of the Buffalo Common Council assert that evidence presented by the appellees is insufficient as a matter of law to demonstrate a violation of 42 U.S.C. § 1983.

We find, however, that the evidence credited by the district court clearly makes out a prima facie showing of intentional segregation on the part of the city appellants which has not been successfully rebutted. Much relevant evidence of deliberate segregation has been mustered by the district court in its April 30 opinion, and it will serve no useful purpose to reiterate those findings here. We will, however, indicate those areas which we believe demonstrate, with the requisite degree of certainty, a violation of § 1983 by the city appellants.

---

**17.** A similar approach is forcefully defended in Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction,* 86 Yale L.J. 317 (1976).

**18.** See *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976).

**19.** These factors include disproportionate impact, the historical background of the challenged decision, specific antecedent events, departures from normal procedures, and contemporary statements of intention on the part of the decisionmakers.

Since 1950, Buffalo has experienced a population decline as individuals moved from the central city to Buffalo's suburbs. At the same time, Buffalo's black population has increased from 6.5% in 1950 to 21% in 1970. Few of Buffalo's blacks live in suburban areas, the majority being concentrated in portions of the inner city. A similar pattern exists in the Buffalo Public School System, where the total student population fell during the period 1966–73 while the minority population rose from 35% to 45.8%.[20]

In 1973–74, the time of the trial of this case, the Buffalo Public School System consisted of 77 elementary schools, 4 middle schools, 2 junior high schools, 7 academic high schools, and 6 vocational-technical high schools. While segregation was never mandated by New York State law, significant racial imbalance existed and continues to exist in the schools.

The appellants argue that this imbalance is the product of minority residential patterns coupled with a racially neutral "neighborhood school" policy observed by the school board. But while the racial imbalance in the schools is no doubt partly a product of increasing minority population concentration, this factor alone cannot account for the *extent* of the racial imbalance in the Buffalo schools.

The district court acted well within its discretion in finding, for example, that the Buffalo school board redistricted East High School in a series of actions which began at least as early as 1954. The cumulative effect of these actions was the exclusion from the district of areas of white population density and the inclusion of areas of black population density, making East High School virtually an all-black school. Furthermore, the school board permitted students to transfer from their local high schools when those schools did not teach a particular foreign language which the student wished to study. Substantial evidence indicates that this policy was used to manipulate the racial composition of East High School by systematically permitting white students to transfer to high schools with white majorities. In at least some instances, different standards for obtaining "language transfers" were applied to black and white students.

The school board was put on notice as early as 1962–63 that "language transfers" of this sort contributed to increased racial segregation in the Buffalo schools. Nevertheless, it continued to permit this policy. Transfers of white students from predominantly black schools were not limited to East High School, but existed in a number of other schools in the city as well.

We believe that Judge Curtin did not err in finding that these changes in attendance zones and the granting of language transfers had the natural and foreseeable effect of increasing racial segregation in the Buffalo schools. At the same time, alternative policies were available to the Board which would have achieved its educational goals while avoiding increased segregation. It follows that the Board's policies give rise to a valid presumption of intentional segregation by Buffalo school authorities.

The district court further found that while the siting of Woodlawn School in the North Masten District was based on racially neutral economic and demographic considerations, the formulation of the school's attendance zone was not. While several possible arrangements which permitted integrated education were proposed, that plan which resulted in the school's having a student population over 99% black was selected. Evidence suggests that this decision was strongly influenced by residents who opposed integrated schooling.

The school board permitted the operation of "optional areas," allowing white students to avoid attending predominantly black schools. This policy clearly had the foreseeable effect of contributing to racial segregation in the Buffalo schools.

Furthermore, discriminatory admission policies in the city's vocational schools, and racially biased recruiting and assignment of staff members, suggest intentional segregation by the school board.

20. The absolute number of minority students fell during the period 1970–73.

Such a finding is also supported by the Board's record of "dilatory, evasive, and at times obstructionist" actions in response to the State's order to integrate. The Board consistently acted to thwart the directives of the Commissioner of Education and the Board of Regents, and relented only after undue delay and extreme pressure. The Common Council aided the Board in the matter by systematically denying funding to programs which would have encouraged racial integration.

■ We are unable to imagine a set of facts, short of a public admission of wrongdoing, which would be more suggestive of intentional discrimination. We are confronted here with a pattern of action and inaction the natural and foreseeable consequence of which is the increased segregation of the Buffalo public schools. This being sufficient to make out a prima facie case of intentional segregation, it must be inquired whether the appellants have been able to rebut this conclusion. We find nothing in the record, however, which suggests a neutral, non-discriminatory rationale for the pattern of actions taken by the city appellants. No policy, save segregation itself, can consistently explain the pattern of transfers, zoning, optional attendance areas, staff recruitment and assignment, and general obstructionism which marks the actions of the city appellants.[21] We consequently approve the finding of the district court that these appellants acted in intentional violation of 42 U.S.C. § 1983.[22]

### The State Appellants

The record is significantly different with respect to the state appellants. As early as 1960, the New York State Board of Regents issued a policy statement urging desegregation of New York's public schools. This

expression of intent has been reaffirmed on many subsequent occasions.

In 1964, parents of Buffalo schoolchildren appealed to the New York State Commissioner of Education, charging that Buffalo had fixed the attendance zone of a junior high school in such a manner as to make the student population over 90% black. The Commissioner found that *de facto* segregation existed in Buffalo, and ordered the Board of Education to submit an integration plan within three months.[23] The Commissioner subsequently found this plan inadequate, and appointed an Advisory Committee to develop a satisfactory program.

The Buffalo Board of Education approved the proffered program "in principle," but then submitted a plan which the Commissioner found "disappointing and unsatisfactory." Finally, on January 30, 1968, the Board submitted a plan which the Commissioner found acceptable. The Board was then ordered to submit periodic reports on the implementation of the program.

This plan, had it been implemented, would likely have reduced racial segregation in the Buffalo schools, but the City's Common Council refused to appropriate funds to implement the Board's plan. In January, 1972, the Commissioner instructed the Board to submit a new desegregation plan; the Board refused to submit such a plan. The Commissioner then sent members of his staff to Buffalo in order to work with the Board in designing a desegregation plan. The Commissioner's staff submitted its recommendations to the Board in November, 1972, but the Board rejected the proposals.

Finally, in January, 1975, following recovery from a heart attack, the Commissioner issued a show cause order to the

---

**21.** Neighborhood school assignment policies are lawful only so long as they are applied consistently and in a racially neutral manner. In the instant case, however, neighborhood schools were used only as a subterfuge to mask a consistent and ongoing pattern of discrimination.

**22.** Finding, as we do, that there is sufficient evidence in this case to sustain the trial court's

finding of segregative intent on the part of the city appellants, we do not today reach the issue of the relevance of evidence related to independent governmental action which furthers discrimination in residential housing patterns.

**23.** *Matter of the Appeal of Yerby Dixon*, 4 Ed.Dept.Rep. 115 (1965).

Buffalo Board of Education in which he threatened to exercise his statutory enforcement powers.

Authority over education in New York State is vested in the Department of Education, which manages and supervises all New York State public schools. The Board of Regents is the statutory head of the Department of Education, and the Commissioner of Education is the chief executive officer of the department. The Commissioner is responsible for the implementation of educational policy formulated by the Board. He can enforce his directives by removing any school officer or member of a board of education who disobeys an order, and by withholding funds from a disobedient school system.

Appellees argue on this appeal that, having primary responsibility for educational policy in New York State, the state appellants are liable for Buffalo's school segregation. They assert that the appellants are liable both because they failed to combat segregation as aggressively as they might have, and, in a derivative sense, because they are legally responsible for the City's segregative acts.

We cannot disagree with the trial court's finding that it would have been possible for the state appellants to have intervened more forcefully in this matter. Nor can we say that, given the chosen policies of the state appellants, it was unforeseeable that the Buffalo schools might remain segregated for an extended period of time.

We do not, however, believe that this kind of inaction on the part of state supervisory personnel can, under the standards promulgated by the United States Supreme Court, be said to constitute intentional segregation, and hence a constitutional violation. As we indicated in *Hart v. Community School Board, supra,* 512 F.2d at 48:

> We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation.

To argue otherwise would be to adopt the strictly objective view of segregative intent rejected above because it collapses *de facto* and *de jure* segregation, in effect making all continued toleration of segregation *de jure.* The state appellants have shown that legitimate policy considerations warranted their hesitation in intervening actively in the conduct of the Buffalo school system, and that the drastic remedies available to them could legitimately have been judged inappropriate under the circumstances of this case.

Of course, if it could be shown that state and local officials conspired to thwart state anti-segregation policy, our conclusion would perforce be different. But we have searched the record, and are unable to find any indication of such complicity, posturing, or bad faith.

Similarly, we do not believe that the appellees' theory of derivative or indirect liability can be sustained. Such a theory is precluded by the Supreme Court's opinion in *Rizzo v. Goode, supra,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, which requires a more direct link between the illicit school segregation and an intentional policy adopted by the state appellants which indicates specific approval of the actions of the city appellants. No such approval is indicated in this case.

Under the standard announced in *Hart,* then, we are unable to conclude that the state appellants acted or omitted to act with the required segregative intent, and hence we must reverse the trial court's finding of liability as to these appellants.

### Remedy

Thus far we have been exclusively concerned with determining whether constitutional violations can properly be attributed to some or all of the named appellants. While the trial court has taken some preliminary steps in the formulation of an appropriate remedy, no final order has issued in this case. The appellants, however, raise the issue of the appropriateness of an interdistrict remedy, citing paragraph no. 18 of the court's order of July 9, 1976. Appendix,

1286 A and B. We believe, however, that it is both premature and unwise to discuss the appropriateness of any partial remedy in a piecemeal fashion, and in the absence of a more fully-developed record.

■ Two points with respect to remedy can, however, be considered. First, the Supreme Court has made clear in its recent opinions that not only must a remedy be appropriate to an infraction, but also that it can reach no further than the incremental harm caused by the infraction itself. In the words of Mr. Justice Rehnquist:

> If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the . . . school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. [Citation omitted.] [*Dayton Board of Education v. Brinkman*, 433 U.S. 406, at 420, 97 S.Ct. 2766 at 2775, 53 L.Ed.2d 851 (1977)].

See also *School District of Omaha v. United States*, 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977) (per curiam).

■ At the same time, proof that authorities have pursued an intentional segregative policy in a "substantial portion" of a school district creates a rebuttable presumption that the entire school system is unlawfully segregated, unless the system is divided into "clearly unrelated units." *Keyes v. School District No. 1, Denver, Colorado, supra,* 413 U.S. at 201–03, 93 S.Ct. 2686.

■ Second, while we rejected the appellants' argument that the changing composition of the Buffalo School Board insulated the Board and its members from potential liability under 42 U.S.C. § 1983, the fact that some present incumbents did not participate in the unlawful acts complained of

is of substantial legal significance. In formulating a remedy which invokes prospective coercive relief against a successor in office, the trial court must determine that the present incumbent will continue the unlawful practices of his predecessors. See *Mayor of the City of Philadelphia v. Educational Equality League*, 415 U.S. 605 at 621–23, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974). It should be stressed that this is not a matter of jurisdiction or of liability, but rather exclusively one of remedy, and is consistent with general principles of prospective equitable relief.

Affirmed as to city appellants; reversed as to state appellants.